UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARKADIUSZ PIOTROWICZ,

                              Plaintiff,

                    -v.-

TECHTRONIC INDUSTRIES NORTH AMERICA,
INC.; ONE WORLD TECHNOLOGIES, INC.;
RYOBI TECHNOLOGIES, INC.; HOME DEPOT
U.S.A., INC.; and NINGBO DALTON
MACHINERY INDUSTRIAL COMPANY, LTD.,

                              Defendants.

19 Civ. 11522 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Arkadiusz Piotrowicz is a former self-employed carpenter who was seriously injured while using a miter saw that he alleges was defectively designed, manufactured, distributed, and sold by Techtronic Industries North America, Inc. ("Techtronic"); One World Technologies, Inc. ("One World"); Ryobi Technologies, Inc. ("Ryobi," and together with Techtronic and One World, the "Ryobi Defendants"); Home Depot U.S.A., Inc. ("Home Depot"); and Ningbo Dalton Machinery Industrial Company, Ltd. ("Dalton," and together with the Ryobi Defendants and Home Depot, "Defendants"). Plaintiff brought this action under the Court's diversity jurisdiction, asserting claims for strict products liability, negligence, and breach of warranty. In this second round of motion practice, Dalton has moved to dismiss the claims and crossclaims asserted against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons that follow, the Court grants Dalton's motion and dismisses all claims against it.

## BACKGROUND[1]

Dalton's present motion is the second jurisdictional challenge filed in this case.  Previously, P&F Brother Industrial Corp. ("P&F"), who has since been dismissed from the case (*see* Dkt. #121), filed its own motion to dismiss for lack of personal jurisdiction (Dkt. #82).  By Opinion and Order dated April 30, 2021, the Court denied the motion without prejudice and granted limited jurisdictional discovery to determine whether P&F contributed to the ultimate sale of the saw at issue here.  (Dkt. #107).  *See Piotrowicz* v. *Techtronic Indus. N. Am., Inc.*, No. 19 Civ. 11522 (KPF), 2021 WL 1721709, at *6 (S.D.N.Y. Apr. 30, 2021) ("*Piotrowicz I*").  The Court assumes familiarity with the relevant facts set forth in *Piotrowicz I*, and discusses here only the factual and procedural background relevant to resolving the narrow issue now before it.

### A.    Factual Background

### 1.    Plaintiff

Plaintiff is a resident of Brooklyn, New York, who suffered catastrophic injuries while using a miter saw in New Paltz, New York, on August 21, 2018. (FAC ¶¶ 1, 36).[2]  On that date, Plaintiff was using a Ryobi Compound Miter

---

[1]    The facts in this Opinion are drawn primarily from the Fourth Amended Complaint ("FAC" (Dkt. #98)), which is the operative pleading in this case.  The Court also sources facts from the declaration of Jack Cheng submitted in support of Dalton's motion ("Cheng Decl." (Dkt. #143-1)) and the declaration of Jesse M. Minc submitted in opposition to Dalton's motion ("Minc Decl." (Dkt. #144)).

For ease of reference, the Court refers to Dalton's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #143-2); Plaintiff's memorandum of law in opposition to Dalton's motion as "Pl. Opp." (Dkt. #145); and Dalton's reply memorandum of law as "Def. Reply" (Dkt. #153).

[2]    In Plaintiff's words:

Miter saws employ circular cutting blades which are attached to an electric rotary motor and are hand-operated; the saw/machine is

Saw bearing model number TS1552/TS1552DXL (the "Saw") that he had purchased from a Home Depot store located in New York. (*Id.* at ¶¶ 36-37, 73). Plaintiff alleges that, as he was operating the Saw, the Saw malfunctioned and amputated his left hand above the wrist. (*Id.* at ¶ 36). Plaintiff had his hand surgically reattached, but continues to experience adverse sequelae from the accident. (*Id.*). Among other things, Plaintiff has undergone additional surgeries and is recommended to undergo still more; has suffered from infections, scar tissue buildup, immobility, and pain; has been unable to return to work as self-employed carpenter; and is engaged in an intense and ongoing regimen of physical therapy and other treatment. (*Id.*).

### 2.   Dalton

Dalton is a foreign business corporation incorporated in China and headquartered in Yuyao City, Zhejiang, China. (FAC ¶ 18). Dalton designs, manufactures, distributes, and sells tools, power tools, and other electrical equipment. (*Id.* at ¶ 19). According to Dalton, it has never been authorized to conduct business in any country other than China; does not maintain an office or bank account in New York; does not solicit business in New York; has never

---

attached to an articulating arm, which connects to the base of the saw at an angle and which can be moved up/down and turned at various angles to cut wood and other products. Materials are placed on the base of the saw, and the articulating arm is brought down upon the materials when a user wants to make a cut. These types of saws bear the nickname "chop saws" because the articulating arm moves in and up-and-down "chopping" motion during use/cutting.

(FAC ¶ 37; *see also* Minc Decl., Ex. 2A (design drawings of the saw at issue in this case)).

negotiated a contract in New York; and has no employees in New York.  (*See* Cheng Decl. ¶¶ 7, 29-34).  As alleged, however, Dalton transacts business within New York by manufacturing tools and other equipment for use within the state and by supplying and distributing such tools and equipment to third parties, such as the Ryobi Defendants and Home Depot, knowing that the items will be sold, purchased, and used in New York.  (FAC ¶ 20).

Of particular relevance here, Dalton manufactured the Saw and other model TS1552/TS1552DXL miter saws (the "Model Saws") in Yuyao City, Zhejiang Province, China, pursuant to a Supply Agreement (the "Agreement") between nonparties Precision Technology Industries Ltd. ("PTIL") and Techtronic Industries Company, Ltd. ("TTI").  (*See* Cheng Decl. ¶ 14; *see also* Dkt. #147 (sealed Agreement)).[3]  PTIL is a Bermuda corporation that wholly owns Dalton, and TTI is an affiliate of Techtronic.  (Pl. Opp. 6-7; *see also* Minc Decl., Ex. 2 at ¶ 3; Cheng Decl. ¶¶ 12, 16-17).  Although Dalton was not a signatory to the Agreement, the Agreement provided that PTIL would "cause and procure that Dalton complies in all respects with the obligations imposed upon [PTIL] under this Agreement as if [Dalton] were named a party to this

---

[3]  The parties filed the Agreement under seal "to avoid an inadvertent violation of the Confidentiality Order, and out of respect for confidentiality between the parties generally[.]"  (Dkt. #146).  While the Agreement itself is viewable only to the parties and Court, both parties' submissions in connection with Dalton's motion to dismiss reference and discuss specific provisions of the Agreement.  (*See, e.g.*, Pl. Opp. 13 (citing Agreement §§ 2.2-2.3)); Def. Reply 5 (discussing Agreement §§ 5.1-5.5)).  Given that the Court's references and citations to the Agreement substantially mirror those of the parties, the Court finds it unnecessary to redact references to the Agreement in this Opinion.

Agreement in place of [PTIL.]" (Agreement § 4.7.3).  The Agreement, which was executed on July 25, 2002, had an initial term of five years.  (*Id.*, § 9.1).

Several provisions of the Agreement are pertinent here.  Under the Agreement, Dalton and PTIL agreed to manufacture the Model Saws and several other products exclusively for TTI.  (Agreement §§ 2.3, 4.7; *see also id.* at Schedule 1 (listing three additional products)).  In exchange, TTI agreed to use "reasonable endeavors" to order enough of the products identified in the Agreement "as to enable Dalton to operate at close to full capacity" and ensure Dalton and PTIL earned certain minimum revenues.  (*Id.*, § 2.2).  The Agreement further provided that Dalton would manufacture four products for TTI, including three sizes of miter saws and one auto planer, and stated that these products would be "for North America."  (*Id.*, Schedule 1).  Relatedly, TTI warranted in the Agreement that it would "prepare, and obtain, from all relevant authorities prior to shipment … all consents, approvals, licenses, or other documents necessary to permit the Products to be," among other things, imported and sold in the country that TTI specified.  (*Id.*, § 7.1.5).  Lastly, the Agreement provided that PTIL would deliver the products "to the delivery point or points specified in the relevant order" (*id.*, § 5.2), and that "[t]itle to and risk in the [p]roducts shall pass on the date (if any) specified in the order and if none is specified on the physical delivery of the [p]roducts" (*id.*, § 5.5).

The precise path the Model Saws took after leaving Dalton's facility in China is not clearly explained in the parties' papers.  For its part, Dalton explains that purchase orders for the saws originated with TTI and then flowed

downstream from TTI to PTIL, to Far Profits International Partners Limited, and ultimately to Dalton.  (*See* Cheng Decl. ¶ 17).  Invoices for the Model Saws and other products would then flow in the reverse order, beginning with Dalton and ending with TTI.  (*See id.* at ¶ 18).  Dalton further avers that as per the terms of the Agreement, it delivered the Model Saws "Free On Board" at the Port of Ningbo, China, to TTI's designated transporter, and that its responsibility for the saws terminated at that time.  (*Id.* at ¶¶ 20-21; *see also* Agreement § 5.2 (providing that Dalton would "deliver the number of units of the Products specified in the relevant order … to the delivery point or points specified in the relevant order or as the Customer may otherwise direct")).[4]

Plaintiff, meanwhile, relies on certain of the jurisdictional discovery he obtained in the course of P&F's prior jurisdictional challenge to support his claim that Dalton had a more active role in distributing the Model Saws.  (*See* Pl. Opp. 7-10 (citing Minc Decl., Ex. 1)).  Specifically, Plaintiff cites to Home Depot's responses to Plaintiff's first set of interrogatories, which responses state that the Model Saws produced by Dalton under the Agreement were exclusively sold to and distributed by Home Depot and its affiliates and subsidiaries in North America.  (Minc Decl., Ex. 1 at ¶ 2).  As part of this exclusive relationship, Dalton's engineering, regulatory, sales, and distribution teams were in regular contact with One World; Dalton representatives toured

---

[4]     "F.O.B. or Free on Board means that title to the property passes from the seller to buyer at the designated FOB point."  *David J. Joseph Co.* v. *M/V BALTIC*, 64 F. App'x 259, 263 (2d Cir. 2003) (summary order) (quoting *Berisford Metals Corp.* v. *S/S Salvador,* 779 F.2d 841, 843 n.2 (2d Cir. 1985)).

Home Depot stores in South Carolina "and, perhaps, elsewhere"; Dalton manufactured the Model Saws to be compliant with standards applicable to the United States; the operator's manual included with the Model Saws included an address located in South Carolina and listed a United States-based telephone number; and Dalton "arranged" for "most shipments" of the Model Saws "to go directly to a Home Depot facility in the United States." (*Id.* at ¶ 6). Under this arrangement, Home Depot sold 212,053 Model Saws in the United States between 2003 and 2010 (*id.*, Ex. 1C), including the Saw (*id.*, Ex. 1 at ¶ 2).

## B.     Procedural Background

This case was initiated in the United States District Court for the Eastern District of New York on October 23, 2019 (*see* Dkt. #1), and was transferred to this Court on December 17, 2019.[5]  At the time of transfer, the operative pleading was Plaintiff's First Amended Complaint, which named Techtronic, One World, Ryobi, and Home Depot as defendants. (Dkt. #16).  Plaintiff was granted leave to amend his pleading at the initial pretrial conference held in the case (*see* Minute Entry for April 7, 2020), and filed his Second Amended Complaint on April 13, 2020, naming P&F as a defendant and alleging that P&F was responsible for manufacturing the Saw (Dkt. #47 at ¶¶ 14-17).

---

[5]     On December 6, 2019, the Ryobi Defendants and Home Depot moved to transfer venue to the Northern District of New York or, in the alternative, the Southern District of New York pursuant to 28 U.S.C. § 1404(a). (Dkt. #18).  Shortly thereafter, on December 16, 2019, the parties filed a joint stipulation of transfer to the Southern District of New York, which Judge Brian M. Cogan entered the same day.  (Dkt. #23).  The case was then administratively transferred to this District on December 17, 2019.

On July 8, 2020, P&F filed a pre-motion letter requesting a conference regarding its anticipated motion to dismiss Plaintiff's claims against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (Dkt. #64).  P&F explained that its contemplated motion would be based, in part, on its assertion that it did not manufacture the Saw.  (*Id.* at 1-2).  In a responsive letter filed two days later, Plaintiff stated that he and P&F were exploring the possibility of substituting Dalton for P&F, and asked for two weeks to investigate whether such substitution was appropriate.  (Dkt. #65). After Plaintiff and P&F were unable to reach an agreement as to Dalton's substitution (*see* Dkt. #66-70), Plaintiff filed the Third Amended Complaint on August 12, 2020, naming Dalton as an additional defendant.  (Dkt. #74).

P&F filed its motion to dismiss for lack of personal jurisdiction on September 1, 2020.  (Dkt. #82-84).  In his opposition to the motion, Plaintiff asserted that he had established a *prima facie* case of personal jurisdiction over P&F and that he was entitled to jurisdictional discovery before the Court reached the merits of P&F's motion.  (Dkt. #87).  Following the completion of the parties' briefing but prior to the Court's resolution of the motion, Plaintiff filed the Fourth Amended Complaint ("FAC"), the operative pleading in this case, making only non-substantive modifications.  (Dkt. #98).  The parties then stipulated that all responses to the Third Amended Complaint, including P&F's pending motion to dismiss, would be applicable to the FAC.  (Dkt. #103).

In *Piotrowicz I*, the Court denied P&F's motion without prejudice to its renewal following the completion of limited jurisdictional discovery.  *See* 2021

8

WL 1721709, at *6.  The Court found that "Plaintiff's allegations regarding P&F's role in the design, manufacture, and distribution of the Saw itself or components thereof, and P&F's knowledge that it was participating in and receiving substantial revenue from a stream of commerce that reached New York customers," were sufficient at the motion to dismiss stage to establish personal jurisdiction.  *Id.*  The Court then exercised its discretion to order limited jurisdictional discovery into P&F's role in manufacturing or distributing the Saw and P&F's relationship with Dalton in 2007.  *Id.*  Following the completion of this limited discovery, on August 26, 2021, Plaintiff and P&F stipulated to the dismissal of Plaintiff's claims against P&F.  (Dkt. #121).

On October 14, 2021, Plaintiff filed a certificate of service reflecting that he had served Dalton through the Hague Convention on October 14, 2021. (Dkt. #127).  Following service on Dalton, the Ryobi Defendants and Home Depot filed a consolidated answer to the FAC, asserting two crossclaims against Dalton.  (Dkt. #132).  On January 18, 2022, counsel for Dalton filed a notice of appearance for the limited purpose "of asserting jurisdictional defenses" on Dalton's behalf.  (Dkt. #142).  Dalton then filed its answer to the FAC on December 6, 2021, asserting as an affirmative defense that the Court lacked personal jurisdiction over it concerning all causes of action and claims for relief asserted by any party.  (Dkt. #132, First Affirmative Defense).  Shortly thereafter, on December 13, 2021, Dalton filed a pre-motion letter, requesting a conference to discuss its anticipated motion to dismiss both the FAC and all

crossclaims asserted against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  (Dkt. #138).

By endorsement dated December 16, 2021, the Court dispensed with its requirement of a pre-motion conference and set a briefing schedule for Dalton's motion.  (Dkt. #141).  Dalton filed its opening motion and supporting papers on January 18, 2022.  (Dkt. #143-144).  Plaintiff filed his memorandum in opposition to the motion and a supporting affirmation on February 3, 2022. (Dkt. #145, 147).  The Ryobi Defendants and Home Depot filed their opposition papers to Dalton's motion on February 11, 2022.  (Dkt. #151-152).  Dalton filed a reply brief in further support of its motion on March 1, 2022.  (Dkt. #153). On May 10, 2022, the Ryobi Defendants and Home Depot filed a letter withdrawing their opposition to Dalton's motion.  (Dkt. #154).  The Court endorsed these defendants' letter the next day, stating that it would not consider their opposition papers when resolving Dalton's motion.  (Dkt. #155). Accordingly, Dalton's motion is fully briefed and ripe for the Court's decision.

## DISCUSSION

### A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  "A plaintiff must establish the court's jurisdiction with respect to each

claim asserted[.]" *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (internal quotation marks omitted).

"The showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it varies depending on the procedural posture of the litigation." *Dorchester Fin. Secs., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (internal quotation marks omitted). "Prior to trial ... when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a *prima facie* showing[]" of jurisdiction. *MacDermid, Inc.* v. *Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft* v. *Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). "Such showing may be made by pleadings and affidavits 'containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *Gen. Elec. Int'l, Inc.* v. *Thorco Shipping Am., Inc.*, No. 21 Civ. 6154 (JPC), 2022 WL 1748410, at *4 (S.D.N.Y. May 31, 2022) (quoting *Whitaker* v. *Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).[6]

When evaluating whether Plaintiff has met his burden at this early stage, "the Court may look beyond the four corners of the complaint and consider

---

[6]    While Plaintiff received limited jurisdictional discovery into P&F's role in manufacturing and distributing the Model Saws earlier in this case, *see Piotrowicz I*, 2021 WL 1721709, at *6 (authorizing discovery), he has not received jurisdictional discovery from Dalton directly. (*See* Pl. Opp. 10 (stating that "[t]o date, no depositions have been done; and no discovery, apart from Mr. Cheng's Declaration, has been exchanged by Dalton")). As reflected in the parties' briefs, Plaintiff must therefore make only a *prima facie* showing of personal jurisdiction at this stage. (*See* Def. Br. 3; Pl. Opp. 12). The Court therefore applies the *prima facie* standard in its analysis.

materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials." *Vasquez* v. *Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 245 n.1 (S.D.N.Y. 2020). "The Court will 'construe all pleadings and affidavits in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor.'" *Brownstone Inv. Grp. LLC* v. *Bonner & Partners, LLC*, No. 20 Civ. 7351 (AJN), 2021 WL 3423253, at *2 (S.D.N.Y. Aug. 5, 2021) (internal brackets omitted) (quoting *Penguin Grp. (USA) Inc.* v. *Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)).

## B.   Analysis

At the outset, the Court pauses to consider the significance of Dalton's decision to file an answer to the FAC prior to raising its present motion. Generally, Rule 12(b) of the Federal Rules of Civil Procedure requires that a motion to dismiss for lack of personal jurisdiction be made before a responsive pleading, such as an answer. *See* Fed. R. Civ. P. 12(b). "Nonetheless, 'federal courts have allowed untimely [Rule 12(b)(2)] motions if the defense has been previously included in the answer.'" *Polaz* v. *Bowers Trucking, LLC*, No. 18 Civ. 527 (ARR) (SJB), 2018 WL 1413454, at *2 (E.D.N.Y. Mar. 20, 2018) (quoting 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 1361 (3d ed. 2020)); *accord N.Y. Cent. Mut. Fire Ins. Co.* v. *Icon Health & Fitness*, Inc., No. 19 Civ. 63 (EAW), 2020 WL 2839319, at *1 (W.D.N.Y. June 1, 2020); *Johnson* v. *Brickhouse*, No. 01 Civ. 9386 (LMM), 2003 WL 355236, at *3 (S.D.N.Y. Feb. 18, 2003). Here, Dalton raised the Court's purported lack of personal jurisdiction throughout its answer and as an affirmative defense. (*See*

Dkt. #132, First Affirmative Defense).  Accordingly, the Court will consider Dalton's untimely jurisdictional challenge.

Turning to the merits of Dalton's motion, the Court's analysis proceeds in two parts.[7]  It is "well-established that 'the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits[.]'"  *Kernan* v. *Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999) (quoting *Arrowsmith* v. *United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963)).  Thus, the Court begins by considering whether "a New York statute allows [Dalton] to be haled into court[.]"  *Lavazza Premium Coffees Corp.* v. *Prime Line Distribs. Inc.*, No. 20 Civ. 9993 (KPF), — F. Supp. 3d —, 2021 WL 5909976, at *8 (S.D.N.Y. Dec. 10, 2021).  The Court then determines whether "exercising personal jurisdiction over the defendant is consistent with due process."  *Id.*  As explained below, the Court finds that Plaintiff has met his burden of establishing jurisdiction under New York law, but that the exercise of jurisdiction would not comport with due process.  The Court therefore grants Dalton's motion to dismiss.

### 1.    New York Long-Arm Jurisdiction

The Court begins by considering whether Dalton's alleged activities bring it within reach of New York's long-arm statute.  *See* N.Y. C.P.L.R. § 302.[8]

---

[7]    "In general, … before a district court may lawfully exercise personal jurisdiction over a party: … the plaintiff's service of process upon the defendant must have been procedurally proper[.]"  *Esso Expl. & Prod. Nigeria Ltd.* v. *Nigerian Nat'l Petro. Corp.*, No. 19-3159, 2022 WL 2542031, at *8 (2d Cir. July 8, 2022).  Because Dalton does not challenge its service here, the Court does not address the issue further.

[8]    *See* N.Y. C.P.L.R. § 302(a):

Plaintiff alleges that Dalton's activities are sufficient to confer jurisdiction under Section 302(a)(3)(ii) of the statute.  (*See* FAC ¶ 27; *see also* Pl. Opp. 13-16.  That provision of the long-arm statute provides that courts may exercise personal jurisdiction over a non-domiciliary tortfeasor if (i) it or its agent commits a tortious act outside of New York that injures someone in New York and (ii) the tortfeasor expects (or should reasonably expect) the act to have consequences in New York and derives substantial revenue from interstate or international commerce.  *See* N.Y. C.P.L.R. § 302(a)(3)(ii).

Of the elements described above, Dalton challenges only the reasonable foreseeability requirement here.  "Whether a defendant expected or should have expected his act to have consequences in New York is an objective test." *Berdeaux* v. *OneCoin Ltd.*, 561 F. Supp. 3d 379, 409 (S.D.N.Y. 2021).  "'New York courts have asserted that the simple likelihood or foreseeability that a

---

(a) Acts which are the basis of jurisdiction.  As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

14

defendant's product will find its way into New York' is insufficient, 'and that purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required.'" *Brownstone Inv. Grp. LLC*, 2021 WL 3423253, at *4 (quoting *Kernan*, 175 F.3d at 241).  Thus, to meet this element, "'foreseeability must be coupled with evidence of a purposeful New York affiliation,' such as 'a discernible effort to directly or indirectly serve the New York market[.]'" *Zanotti* v. *Invention Submission Corp.*, No. 18 Civ. 5893 (NSR), 2020 WL 2857304, at *15 (S.D.N.Y. June 2, 2020) (quoting *Schaadt* v. *T.W. Kutter, Inc.*, 564 N.Y.S.2d 865, 866 (3d Dep't 1991)).

As to this element, Plaintiff argues that jurisdiction is appropriate under Section 302(a)(3)(ii) because Dalton "was clearly involved in a substantial stream of international commerce, and should have expected that its activities in connection with the manufacturing of the Model Saw (and, thus, the Saw itself) to have consequences in New York[.]"  (Pl. Opp. 13).  In Plaintiff's words, Dalton "engaged in a manufacturing operation and chain of international distribution with its ultimate customer … being a single United States-based company (Home Depot) with nearly one hundred retail locations in New York[.]"  (*Id.* (citing Minc Decl., Ex. 4 at 15)).  Plaintiff supports this claim by pointing to several provisions of the Agreement, including Dalton's obligation to sell its products, such as the Model Saw, exclusively to TTI (Agreement, § 2.3); the Agreement's provision that Dalton's products would be distributed exclusively

to North America (*id.*, Schedule 1); and the fact that approximately 95% of the products were sold in the United States (Minc Decl., Ex. 1C).

While the Court finds it to be a close call, it ultimately concludes that Plaintiff has met his burden at this stage of establishing jurisdiction over Dalton under New York's long-arm statute. The Court's decision is guided in large measure by the Second Circuit's decision in *Kernan* v. *Kurz-Hastings*. *See* 175 F.3d at 240-42 (analyzing personal jurisdiction under Section 302(a)(3)(ii)). There, the court addressed "the question of whether a New York court has personal jurisdiction over a Japanese manufacturer of a machine said to have caused plaintiff's injuries in circumstances where the manufacturer's distributor in Pennsylvania sold the machine to plaintiff's employer in New York." *Id.* at 238. Observing that "it is admittedly a close question," the court concluded that jurisdiction was proper under Section 302(a)(3)(ii). *Id.* at 242. The court based its decision on the fact that the manufacturer and distributer operated under an exclusive sales agreement, which enabled the distributor to sell machines throughout the United States and provided for the exchange of sales and other information between the parties. *Id.* "These facts," the Second Circuit concluded, "convince us that [the defendant] did indeed attempt to serve the New York market, even if it did so indirectly[.]" *Id.*[9]

---

[9]     As Dalton observes, *Kernan* has come under significant stress since the Supreme Court's decision in *J. McIntyre Mach., Ltd.* v. *Nicastro.* 564 U.S. 873 (2011). (*See* Def. Reply 8 (arguing that "[a]n analysis of [Section 302(a)(3)(ii) as interpreted by *Kernan* … is outdated and incomplete")). *See State Farm Fire & Cas. Co.* v. *Swizz Style, Inc.*, 246 F. Supp. 3d 880, 891 (S.D.N.Y. 2017) (stating that "[c]ourts in this Circuit have also recognized that *Kernan* may be in conflict with" *Nicastro*) (collecting cases); *see also J. McIntyre Mach., Ltd.* v. *Nicastro*, 564 U.S. 873, 910 (2011) (Ginsburg, J., dissenting) (identifying *Kernan* as being in tension with the majority opinion); Oscar G. Chase &

16

Here, as in *Kernan*, Dalton manufactured the relevant products outside of New York pursuant to an exclusive distribution agreement.  Under the Agreement, as discussed earlier, Dalton manufactured the Model Saws in China and sold them exclusively to PTIL.  (*See* Agreement § 4.7.1).  PTIL, in turn, sold the Model Saws to TTI (*id.*), and the saws were ultimately exclusively sold to and distributed by Home Depot in North America (*see* Minc Decl., Ex. 1 at ¶ 2; *see also* Cheng Decl. ¶¶ 16-17).  Through this exclusive distribution arrangement, Home Depot sold more than 212,000 Model Saws in the United States between 2003 and 2010.  (Minc Decl., Ex. 1C).  Notably, Home Depot made one such sale to Plaintiff in New York.  (*See* FAC ¶ 25).

To be sure, the Agreement is not identical to the agreement addressed in *Kernan*.  The Agreement does not, for instance, provide "for the exchange of information relevant to product development, as well as pricing information[.]" *Kernan*, 175 F.3d at 242.  But the Court does not view this distinction as sufficient to defeat jurisdiction under New York's long-arm statute.  As another court has observed, *Kernan*'s finding of jurisdiction "relied heavily on the fact" that the foreign manufacturer had entered into an exclusive sale agreement with the domestic distributor.  *Astor Chocolate Corp.* v. *Elite Gold Ltd.*, 510 F.

_____

Lori Brooke Day, *Re-Examining New York's Law of Personal Jurisdiction After Goodyear Dunlop Tires Operations, S.A.* v. *Brown and J. McIntyre Machinery, Ltd.* v. *Nicastro*, 76 ALA. L. REV. 1009, 1046 (2012) (observing that "[p]erhaps the most troubling precedent for New York courts is a Second Circuit case, *Kernan* v. *Kurz-Hastings, Inc.*").  But *Nicastro* addressed the Due Process Clause, not New York's long-arm statute.  *See Nicastro*, 564 U.S. at 877.  Thus, "[c]ourts in this Circuit have determined that '[u]ntil the Second Circuit directly addresses *Kernan*, it controls this Court's analysis of jurisdiction pursuant to' Section 302(a)(3)(ii)."  *RegenLab USA LLC* v. *Estar Techs. Ltd.*, 335 F. Supp. 3d 526, 542 (S.D.N.Y. 2018) (collecting cases).

Supp. 3d 108, 132-33 (S.D.N.Y. 2020).  Indeed, the Second Circuit relied on the fact of that exclusive sale agreement to distinguish the case "from an earlier New York case that held 'that the sole fact that the company had sold its products to a Massachusetts company, which then sold the machines throughout the United States, was insufficient to satisfy [Section] 302(a)(3)(ii)'s 'reasonable expectation' requirement.'"  *Id.* (quoting *Kernan*, 175 F.3d at 242).  Given the existence of a materially similar agreement in both cases, *Kernan* "controls this Court's analysis of jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(ii)" and dictates that Plaintiff has met his burden of establishing jurisdiction under New York's long-arm statute.  *State Farm Fire & Cas. Co.* v. *Swizz Style, Inc.*, 246 F. Supp. 3d 880, 888 (S.D.N.Y. 2017).

The Court's finding of jurisdiction under these circumstances is also consistent with a line of decisions exercising "jurisdiction over out-of-state manufacturers based upon product sales to New York consumers through third-party distributors" where the parties asserting jurisdiction were able to point to exclusive distribution agreements between the foreign manufacturer and third-party distributor[.]"  *Lombardi* v. *Staples, Inc.*, No. 15 Civ. 6158 (SJF) (AKT), 2016 WL 11509961, at *4 (E.D.N.Y. Dec. 15, 2016) (collecting cases); *see also Swizz Style, Inc.*, 246 F. Supp. 3d at 888 (finding jurisdiction under New York's long-arm statute over a foreign manufacturer that supplied goods to an Ohio-based corporation pursuant to a distribution agreement); *Ikeda* v. *J. Sisters 57, Inc.*, No. 14 Civ. 3570 (ER), 2015 WL 4096255, at *5 (S.D.N.Y. July 6, 2015) (finding jurisdiction under Section 302(a)(3)(ii) where the

defendant sold its products exclusively through a domestic distributor that then sold the products in New York); *UTC Fire & Sec. Americas Corp.* v. *NCS Power, Inc.*, 844 F. Supp. 2d 366, 375 (S.D.N.Y. 2012) (finding, in a case where a defendant "delivered a high volume of batteries … to a major electronics distributor in North America" and "did so with the expectation — indeed, the hope — that they would be sold to customers in markets throughout the United States," that "it strains credulity that [defendant] could not have foreseen that its actions would have consequences in New York"); *Darrow* v. *Deutschland*, 990 N.Y.S.2d 150, 151 (3d Dep't 2014) (holding that foreign manufacturer that distributed its products through a domestic distributor that then resold the products throughout the United States could reasonably foresee that its acts would have consequences in New York and was subject to personal jurisdiction in the state).

For these reasons, the Court finds that Dalton is subject to the Court's jurisdiction under Section 302(a)(3)(iii) of New York's long-arm statute.

## 2.    Constitutional Due Process

The Court now turns to the core of Dalton's jurisdictional challenge, which asserts that the Court cannot exercise specific personal jurisdiction over it consistent with the Due Process Clause.[10]  The Court begins by outlining the

---

[10]    Dalton also argues that it is not subject to general jurisdiction in New York (Def. Br. 4-5), which Plaintiff does not dispute (*see* Pl. Opp. 12 ("Dalton is concededly a foreign corporation with no offices or operations based in the United States; and, thus, general personal jurisdiction over it cannot be asserted.")).  The Court agrees with the parties that general jurisdiction is inapplicable here.  As the Supreme Court has explained, "[t]he 'paradigm' forums in which a corporate defendant is 'at home,' [such that it is subject to the forum state's general jurisdiction,] … are the corporation's place of incorporation and its principal place of business."  *BNSF Ry. Co.* v. *Tyrrell*, 137 S. Ct.

applicable legal standard before turning to the parties' arguments.  As
previewed earlier, the Court finds that Plaintiff has not met his burden of
demonstrating that due process permits jurisdiction on this record.

a. **Applicable Law**

"The Due Process Clause of the Fourteenth Amendment constrains a
State's authority to bind a nonresident defendant to a judgment of its courts."
*Walden* v. *Fiore*, 571 U.S. 277, 283 (2014).  Thus, "[o]nce a *prima facie* showing
of a statutory basis for jurisdiction has been made, the plaintiff must
'demonstrate that the exercise of personal jurisdiction comports with due
process.'"  *Giannetta* v. *Johnson*, No. 20 Civ. 9016 (PAE), 2021 WL 2593305, at
*5 (S.D.N.Y. June 24, 2021) (quoting *Charles Schwab Corp.*, 883 F.3d at 82).
"The constitutional analysis under the Due Process Clause consists of two
distinct inquiries: into 'minimum contacts' and 'reasonableness.'"  *Id.* at *5.

The minimum contacts inquiry addresses the relationship of both the
defendant to the forum and the plaintiff's claim to the defendant's activities in
the forum.  A defendant has sufficient contact with the forum for due process
purposes where it takes "some act by which it purposefully avails itself of the
privilege of conducting activities within the forum State."  *Ford Motor Co.* v.
*Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (internal quotation
marks and alterations omitted).  "The contacts must be the defendant's own

---

1549, 1558 (2017) (quoting *Daimler AG* v. *Bauman*, 571 U.S. 117, 137 (2014)).  Here,
Dalton is incorporated and has its principal place of business in China (*see* FAC ¶ 18),
and thus is not subject to general jurisdiction in New York.  The Court therefore
addresses only specific personal jurisdiction in the remainder of this Opinion.

choice and not 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton* v. *Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).  In other words, these contacts "must show that the defendant deliberately 'reached out beyond' its home — by, for example, 'exploiting a market' in the forum State or entering a contractual relationship centered there." *Id.* (quoting *Walden*, 571 U.S. at 285).  And the plaintiff's claims bear a sufficiently close relationship to the defendant's activities in the forum where they "arise out of or relate to the defendant's contacts with the *forum*." *Bristol-Myers Squibb Co.* v. *Sup. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017) (internal alterations omitted).  Put differently, "'there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919 (2011)).

"[O]nce it is established that the defendant has minimum contacts with the forum and the cause of action relates to or arises from those contacts, 'a court considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" *U.S. Bank Nat'l Ass'n* v. *Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) (quoting *Charles Schwab*, 883 F.3d at 82) (internal quotation marks omitted).  When engaging in this analysis, the court must consider five factors: "[i] the burden that the exercise of jurisdiction will impose on the defendant; [ii] the interests of the forum state in adjudicating the case; [iii] the plaintiff's interest in obtaining convenient and effective relief; [iv] the

interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [v] the shared interest of the states in furthering substantive social policies. *Eades* v. *Kennedy, PC L. Offs.*, 799 F.3d 161, 169 (2d Cir. 2015).

###   b.   Analysis

The parties in this case focus their briefing exclusively on the minimum contacts aspect of the due process inquiry. Dalton argues that Plaintiff has failed to establish that it had sufficient contacts with New York because its alleged conduct occurred entirely in China and "it is only by the conduct of others that the Saw ended up in New York." (Def. Br. 10). More specifically, Dalton asserts that it (i) did not enter into a contract in New York or enter into a contract to deliver the Model Saws to New York; (ii) did not sell products directly to purchasers in New York; (iii) had "no detailed knowledge" of where the products it manufactured would be distributed or sold; (iv) had no knowledge of the amount or value of Model Saws sold in New York; and (v) did not ship products directly to New York and, in fact, delivered products only to the Port of Ningbo, China. (Cheng Decl. ¶¶ 23-27). In opposition, Plaintiff again points to Dalton's role under the Agreement in manufacturing the Model Saws for exclusive distribution and sale throughout North America to argue that Dalton had extensive and sustained contacts with New York in the form of a consistent stream of sales of the Model Saws. (Pl. Opp. 18).

As both parties observe in their briefing (*see* Pl. Opp. 18; Def. Reply 8), Dalton's motion implicates the Supreme Court's decision in *J. McIntyre Mach.,*

*Ltd.* v. *Nicastro*, 564 U.S. 873 (2011).  In that case, the Supreme Court of New Jersey had "held that New Jersey's courts can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Id.* at 877 (internal quotation marks omitted).  The Supreme Court reversed in "two fractured, non-majority opinions[.]" *Astor Chocolate Corp.*, 510 F. Supp. 3d at 133 n.12.  Writing for a four-Justice plurality, Justice Kennedy explained that the case "center[ed] on three facts: The distributor agreed to sell J. McIntyre's machines in the United States; J. McIntyre officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey." *Nicastro*, 564 U.S. at 886 (internal quotation marks omitted).  "These facts may reveal an intent to serve the U.S market," Justice Kennedy concluded, "but they do not show that J. McIntyre purposefully availed itself of the New Jersey market." *Id.*  "Concurring, Justice Breyer concluded that the outcome was 'determined by our precedents,' and '[n]one of our precedents finds that a single isolated sale" satisfies minimum contacts.'" *RegenLab USA LLC* v. *Estar Techs. Ltd.*, 335 F. Supp. 3d 526, 544 (S.D.N.Y. 2018) (quoting *Nicastro*, 564 U.S. at 888 (Breyer, J. concurring)).

"Thus, despite the *Kernan* court's determination that exercise of personal jurisdiction was warranted where the manufacturer 'did indeed attempt to [indirectly] serve the New York market,' the revised strictures of due process now require 'something more.'" *Swizz Style, Inc.*, 246 F. Supp. 3d at 890 (citing

*Kernan*, 175 F.3d at 242, and *Nicastro*, 564 U.S. at 889).  Consistent with this standard, "[o]f the courts in this Circuit that have considered *Kernan*-like situations post-[*Nicastro*,]" only two have "found that the exercise of personal jurisdiction over the foreign defendant would not offend due process."  *Id.* at 891.  In the first of these cases, "the foreign manufacturer's agreement with its distributor required it to approve every order it received from that distributor, leading the district court to conclude that the manufacturer had 'presumptive knowledge' over the 'hundreds of thousands' of relevant products sold into New York."  *Astor Chocolate Corp.*, 510 F. Supp. 3d at 133 n.12 (quoting *UTC Fire & Sec. Americas Corp.*, 844 F. Supp. 2d at 369).  And in the second case, a "significant volume" of the manufacturer's sales were "directed to New York" and the manufacturer "was aware of and 'targeted' New York specifically[.]" *Swizz Style, Inc.*, 246 F. Supp. 3d at 892.  By contrast, "where only an exclusive distributorship agreement existed between the distributor and manufacturer and allegations of forum-specific contacts were lacking, courts have understandably found that they cannot constitutionally exercise personal jurisdiction over the manufacturer."  *Id.* at 891 (collecting cases); *see also, e.g.*, *Boris* v. *Atrium Med. Corp.*, No. 18 Civ. 8921 (ALC), 2020 WL 589440, at *4 (S.D.N.Y. Feb. 6, 2020) (holding that "[w]ithout additional allegations that [the defendant] targeted New York or had a regular or high volume of sales in the state, the fact that [the defendant] served as an intermediary in the distribution chain is insufficient to establish specific jurisdiction over it"); *Ikeda*, 2015 WL 4096255, at *8 (finding that defendant lacked minimum contacts with New

York where, among other things, plaintiff had not estimated the volume of products sold in the state or alleged that the defendant made a "specific effort to sell in New York").

Here, Plaintiff has not demonstrated that Dalton had minimum contacts with New York specifically rather than the United States generally.  As discussed, Plaintiff's assertion of jurisdiction rests on Dalton's role as the exclusive manufacturer of the Model Saws.  (*See* Pl. Opp. 4 (arguing that Dalton subjected itself to jurisdiction in New York by "acting as the exclusive manufacturer of hundreds of thousands of products which were sold throughout the United States through a single U.S.-based customer with nearly one hundred retail stores in New York")).  But Dalton's alleged actions taken in connection with the Agreement establish only that Dalton was aware that the Model Saws would be sold and used in the United States, not New York.  For example, Plaintiff asserts that "[d]uring the research and development process of the Model Saw, Dalton's engineering, regulatory, sales and distribution teams regularly communicated with their counterparts at One World, who were all based in the United States."  (*Id.* at 8 (citing Minc Decl., Ex. 1 at ¶ 6)).  While this fact supports Plaintiff's claim that Dalton had purposeful contacts with the United States as a whole, it does not demonstrate that Dalton availed itself of New York in particular.  Similarly, Plaintiff asserts that representatives of Home Depot performed annual factory audits of Dalton's facility in China.  (*Id.*).  Again, this evidence suggests that Dalton was aware that its Model Saws were bound for distribution to and sale by Home Depot in North America, but

not that Dalton had any awareness or involvement in directing the saws to New York.  Indeed, each of Dalton's alleged actions identified in Plaintiff's briefing suffers from this same critical shortcoming.  (*See* Pl. Opp. 8-10).[11]

The balance of the record evidence similarly fails to demonstrate that Dalton engaged in "something more" to permit the Court to exercise personal jurisdiction under the Due Process Clause.  *See Swizz Style, Inc.*, 246 F. Supp. 3d at 890.  There is no evidence, for instance, that Dalton shipped the Model Saws directly to New York.  Rather, both the Agreement and Dalton's declaration submitted in support of its motion demonstrate that Dalton delivered the Model Saws to TTL in China, and that the saws were ultimately delivered to Home Depot in New York through a series of independent third-party transactions.  (*See* Cheng Decl. ¶¶ 16-17, 22; *see also* Agreement § 5.2 (providing that Dalton would deliver the Model Saws "to the delivery point or points specified in the relevant order")).  There is also no evidence that Dalton actively participated in selecting New York as a destination for the Model Saws; that it designed or manufactured the saws specifically for New York customers; or that it received sales figures or other information reflecting the number of saws sold in New York.  (*See* Cheng Decl. ¶¶ 24-26).  *Cf. Swizz Style, Inc.*, 246 F. Supp. 3d at 891 (finding minimum contacts where foreign manufacturer

---

[11]    In fact, the evidence suggests that to the extent Dalton had minimum contacts with a particular state, that state was South Carolina.  (*See* Minc Decl., Ex. 1 at ¶ 6 (stating that Dalton representatives "walked" Home Depot stores in South Carolina "and, perhaps, elsewhere"; the Model Saw's operator manual lists an Anderson, South Carolina, address; and "regular communications" were made between One World located in Anderson, South Carolina, and members of Dalton's engineering, regulatory, sales, and distribution teams")).

"was aware of and 'targeted' New York specifically"); *UTC Fire & Sec. Americas Corp.*, 844 F. Supp. 2d at 376 (finding minimum contacts where foreign manufacturer approved orders submitted by distributor).  Further, while Plaintiff points to the fact that Home Depot operates "nearly one hundred retail stores in New York" to suggest that a substantial number of the saws ultimately made their way into the state, Home Depot lacks records of the number of Model Saws that it actually sold in New York.  (*See* Minc Decl., Ex. 1 at ¶ 4).  *Cf. EMI Christian Music Grp., Inc.* v. *MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (holding that defendant had minimum contacts with New York where he "was aware both that [his company] had at least 400 users located in New York and that his company provided services to New York customers").

Plaintiff's primary legal authority in support of his position only serves to underscore the Court's inability to exercise jurisdiction over Dalton on the record before it.  In his opposition brief, Plaintiff contends that "[f]or much [of] the same reason as in" *Ainsworth* v. *Moffett Eng'g, Ltd.*, a decision of the Court of Appeals for the Fifth Circuit, "Dalton is … subject to personal jurisdiction here."  (Pl. Opp. 20).  *See Ainsworth* v. *Moffett Eng'g, Ltd.*, 716 F.3d 174 (5th Cir. 2013).  *Ainsworth* is a post-*Nicastro* decision addressing whether an Irish corporation that manufactured forklifts pursuant to an exclusive sales and distribution agreement was subject to personal jurisdiction in Mississippi for a death resulting from the malfunctioning of one of the forklifts.  *Id.* at 176.  After engaging in a detailed discussion of the Supreme Court's decision in *Nicastro*, the Fifth Circuit held that the exercise of jurisdiction did not run afoul of due

process.  *Id.* at 179.  The court based its decision on several particular facts,
including: (i) the defendant made no attempt to limit the territory in which the
distributor sold the forklifts; (ii) more than 203 of the forklifts were sold to
customers in Mississippi, accounting for approximately 1.55% of the
distributor's domestic sales of the relevant period; and (iii) the manufacturer
designed the forklifts "for poultry-related uses" and thus could have expected
that the forklifts would be used in Mississippi, "given the fact that Mississippi
is the fourth largest poultry-producing state in the United States."  *Id.*

Several of the forum-specific contacts that were critical to the Fifth
Circuit's due process analysis in *Ainsworth* are lacking here.  For instance, as
just discussed, there is no record of how many Model Saws were sold in New
York.  (*See* Minc Decl., Ex. 1 at ¶ 4).  The Court therefore cannot ascertain
whether Home Depot sold a number approximating the 203 sales in *Ainsworth*.
*See* 716 F.3d at 179.  Relatedly, Plaintiff has not put forward evidence
suggesting that there was a particularly large or unique customer base for the
Model Saws in New York.  *Cf. id.*  Thus, while a forklift manufacturer that
produces its products specifically for poultry producers in the United States
might reasonably anticipate being subject to litigation in one of the leading
poultry-producing states in the country, there is no similar basis upon which
to conclude that a saw manufacturer that targeted the United States as a
whole should anticipate litigating in New York.

The Fifth Circuit itself has distinguished *Ainsworth* on comparable
grounds.  In *Zoch* v. *Magna Seating (Germany) GmbH*, the court was confronted

with the question of whether a foreign manufacturer of vehicle component parts was subject to jurisdiction in Texas because Texas represented a significant market for such parts. *See Zoch* v. *Magna Seating (Ger.) GmbH*, 810 F. App'x 285, 285-86, 291-92 (5th Cir. 2020) (unpublished). While the plaintiff asserted that jurisdiction was proper under the logic of *Ainsworth*, the Fifth Circuit disagreed, finding that the case was "distinct from *Ainsworth*" in several important respects. *Id.* at *292. At the outset, the court brushed aside the plaintiff's assertion that the defendant should have expected to be subject to litigation in Texas based on the number of drivers and vehicles in Texas. "[T]here are drivers and vehicles in each of the fifty states, and [plaintiff's] evidence, at most, proves only that [defendant's contract with a separate vehicle manufacturer] '*might* lead to those products being sold in any of the fifty states.'" *Id.* (quoting *Nicastro*, 564 U.S. at 890-91 (Breyer, J., concurring)). The court further distinguished *Ainsworth* on the bases that the defendant had not entered into an exclusive distribution agreement; the plaintiff had not put forward evidence of the number of products actually sold in Texas or the income generated from those Texas sales; and that under the relevant agreement the defendant lacked control over where its parts would be sold. *Id.* While the cases are not identical in every respect, the Court finds many of the same considerations discussed in *Zoch* compel a similar result here.

\*       \*       \*

On the record before it, the Court concludes that Dalton is not subject to personal jurisdiction in New York. To be clear, the Court is sympathetic to

29

Plaintiff's position.  Per the available evidence, Dalton served an indispensable role in manufacturing hundreds of thousands of saws that were sold to consumers throughout the United States.  (*See generally* Agreement; *see also* Minc Decl., Ex. 1C (sales chart)).  While these efforts earned Dalton significant remuneration, they also resulted in the production and sale of the Saw that is alleged to have caused Plaintiff's serious and long-lasting injuries.  Yet despite Dalton's sustained contacts with the United States as a whole, Plaintiff has not mustered any direct evidence of Dalton's purposeful contact with New York. "*Nicastro* makes clear that a manufacturer's broad desire to target the United States through a distributor will not suffice."  *Williams* v. *Romarm, SA*, 756 F.3d 777, 785-86 (D.C. Cir. 2014).  Accordingly, the Court finds that the exercise of jurisdiction over Dalton would violate due process and grants Dalton's motion to dismiss all claims asserted against it in this action.[12]

---

[12]    As noted earlier, the Ryobi Defendants and Home Depot initially opposed Dalton's motion to dismiss their crossclaims against it (Dkt. #152), but have since withdrawn their opposition (Dkt. #154).  While "the lack of opposition does not, without more, justify dismissal[,]" *James* v. *John Jay Coll. of Crim. Just.*, 776 F. App'x 723, 724 (2d Cir. 2019) (summary order), the analysis contained in this Opinion applies equally to the crossclaims asserted by the Ryobi Defendants and Home Depot.  Indeed, in their since-withdrawn brief in opposition to Dalton's motion, the Ryobi Defendants and Home Depot asserted that jurisdiction was appropriate for the same reasons that Plaintiff advances in his briefing.  (*See* Dkt. #152).  Accordingly, the Court dismiss the crossclaims against Dalton for the reasons stated above.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Dalton's motion to dismiss all claims and crossclaims asserted against it in this action pursuant to Federal Rule of Civil Procedure 12(b)(2).

The remaining parties in the case are hereby ORDERED to submit a proposed case management plan on or before **August 8, 2022**.

The Clerk of Court is directed to terminate the motion at docket entry 143.

SO ORDERED.

Dated:      July 21, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge